## Illinois Central Railroad Co., et al. v. Reed,

(Decided December 13, 1910.)

### Appeal from Muhlenberg Circuit Court.

Railroads—Injury to Shipper—Running Train Against Wagon— Appeal by Railroad Company.—In this action it is shown that appellee had drawn his wagon up to near the railroad track to load on it from the car a saw-mill outfit including a boiler. He located his wagon so near the track that as the train passed the last car struck the front wheels and knocked the tongue around so that it struck appellee and threw him over on his head, injuring him severely. When the train began to move, appellee ran to the wagon and lifted the wheels 12 or 14 inches further from the track. On the trial appellee recovered a judgment for $6,000.00 in damages. Held, on appeal by the railroad company, that this is not a case where the train was moved without any warning. The appellee knew that it was to be moved. Nor is it predicated upon the idea that appellee was not given a reasonable opportunity to reach a place of safety. Before he ran to the wagon he was in a place of safety. The conductor had assured him that the wagon was not in danger. Being afraid of the conductor's judgment, he substituted therefor his own judgment, and did this at a time when those in charge of the train had no notice of his purpose. That being true, they could not have apprehended that he would take such a course. Upon no theory could appellants be held for such consequences as could not have been reasonably anticipated.

BLEWITT LEE, R. Y. THOMAS, JR., TAYLOR & EAVES, C. L. SHIVELEY, and TRABUE, DOOLAN & COX for appellants.

YOST & LAFFOON and HOWARD & GRAY for appellee.

OPINION OF THE COURT BY WM. ROGERS CLAY, COM-MISSIONER—Reversing.

Charging that he was permanently injured by the negligence of appellants, Illinois Central Railroad Company and W. H. Bash, appellee, J. H. Reed, brought this action against them to recover damages. The jury returned a verdict in appellee's favor for $6,000. From the judgment based thereon, this appeal is prosecuted.

Several grounds for reversal are relied upon, but, in view of the conclusion of the court, we deem it necessary to consider and pass upon one question only, i. e.,

whether or not the trial court erred in refusing to award appellants a peremptory instruction.

Prior to the time of the accident, appellee, a farmer of Depoy, Muhlenberg county, had ordered a small sawmill outfit, including a boiler, from a firm in Cincinnati, Ohio, and had it consigned to him at Depoy over the lines of appellant, Illinois Central Railroad Company. On November 4th, 1908, the machinery arrived at Depoy, and notice of its arrival was given to appellee by the agent of the railroad. The railroad runs through Depoy from east to west. On the south side of the railroad are located the ticket office, signal station, etc., while immediately across the main track, and on the north side thereof, is situated a switch track. Branching off from the switch track and extending along the side of it is a spur track long enough to hold some eight or ten cars. The car containing appellee's machinery was placed on the spur track for the purpose of being unloaded. Behind this car there had also been placed some three or four cars of cinders. On the occasion of the accident, which occurred on November 5th, 1908, appellee and his son, Gayle Reed, and a negro named Bard were engaged in unloading the boiler from the car. For that purpose appellee had placed his wagon along the side of the car. After they had prized the boiler over to the side of the car and had placed skids under it extending out to the wagon, appellee's attention was attracted to appellant Bash and his train crew, who were in the act of coupling an engine to the car upon which appellee's machinery was loaded. Appellant Bash had arrived in charge of a coal train consisting of an engine and tender used for the purpose of handling freight cars between Central City and Graham. The train had backed up from Graham, a station a few miles west of Depoy. It came in on the side or passing track, about 200 yards west of the spur track on which the car containing appellee's machinery was placed, and branched off from the side or passing track. Appellant Bash told appellee that he had to have the cars of cinders located behind appellee's car. Appellee protested that his boiler would fall off, but Bash replied by directing him to move the skids from under the boiler so they would not strike an outhouse standing near the railroad track. Appellee then prized up his boiler and removed the skids, during which time he claims that the train crew was making an unsuccessful effort to couple the engine to his car. When the

skids had been removed, appellee inquired of Bash if his wagon was in the way; whereupon Bash replied "No, your wagon is all right." After assuring appellee that his wagon was out of the way, Bash went down the spur track by the cinder cars to get the numbers of the cars and to see that the last car remained on the track. Upon seeing that the wheels of the last car kept on the rails, he gave the engineer the signal to go out. When the train began to move, appellee, becoming afraid that the train might strike his wagon and to make sure that it would not, hurried around to the rear of the wagon. Taking a coupling pole, he lifted the rear wheels of the wagon twelve or fourteen inches further from the car. He then ran to the front end of the wagon, and with the aid of a piece of scantling lifted the front wheels about the same distance from the car. He then threw the scantling down and was standing near the tongue when the last car struck the front wheels of the wagon and knocked the tongue around so that it struck appellee about the knees and threw him over on his head. It is unnecessary to detail the extent of appellee's injuries or to state what thereafter happened, for these matters do not concern the particular question under consideration.

For the purpose of getting before us the full effect of appellee's testimony, we quote in full his evidence with reference to the conductor's assurance and the circumstances attending his injuries:

"Q. You know who the conductor was?"

"A. Mr. Bash."

"Q. Go ahead."

"A. He came up to couple the car and I was preparing this boiler to get it off, prepared the wagon and was getting the boiler in readiness to take it off on the wagon and he run up to the end of the car—"

"Q. With what?"

"A. Engine."

"Q. Run the engine up to the car?"

"A. Yes, sir, and in position to couple."

"Q. Front of the engine or back in?"

"A. Front of the engine, and the conductor came to the front of the engine and I asked him what he meant, and he said he wanted to couple on to that car, and I says to him you are not going to take the car out and my load in this position—"

"Q. Who were you talking to?"

"A. The conductor."

"Q. Mr. Bash, the defendant here?"

"A. Yes, sir; and he says yes, we must have those cars of cinders, and I says are you going to take out my car and my load in this shape, and he says you must take those skids back, and I then mounted the car and my son who was with me, and we got up and prized the end of the boiler next to the engine up and some one pushed the skid back for us."

"Q. Who was on that car with you at the time?"

"A. I don't know besides my son, I was busy, and we then raised the back of the boiler and some one slid the skid back for us, and then I hurried off the car, having but little time, and I asked the conductor should my wagon be moved, and he said no, that was all right and he sighted down the side of the car."

"Q. You asked him if your wagon was to be moved?"

"A. Yes, sir."

"Q. Why did you ask him that?"

"A. I didn't know whether it was too near the car and might be torn up."

"Q. What did he tell you?"

"A. No. I just asked must I move it and he said, 'no.' "

"Q. Then what did you do?"

"A. By this time they were going away, hurrying out, and I was afraid that he might not have noticed the corner enough to know whether the wagon was out of the way or not, and I hurried to the rear of the wagon and took hold of the coupling pole and jerked it back from the track."

"Q. When you moved the hind wheels in that condition did that place the front wheels any closer to the train?"

"A. No, sir."

"Q. Then what did you do?"

"A. I run to the front of the wagon and took a pole that was under this front axle and lifted it up and slewed the front end from the car further."

"Q. How much further did you move the hind wheels from the train than it was when he said it was safe?"

"Objected to—overruled—to which the defendant excepted."

"A. About 12 or 14 inches."

"Q. How much further from the train did you move the front wheels of the wagon than when the conductor told you it was safe?"

"A. Twelve or fourteen or fifteen inches, not positive exactly about that."

"Q. Was it possible for you to have gotten the front wheels any closer to the car in moving it that way than it was before?"

"A. No, sir."

"Q. You moved it 12 or 14 inches further away?"

"A. Yes, sir."

"Q. Here is the tongue; you say that was pointing east?"

"A. Yes, sir."

"Q. That may be intended to represent the wagon, take it that way for the moment, which side were you on of the tongue?"

"A. North side."

"Q. Tell the jury what occurred."

"A. I think about two-thirds of the distance from the wagon to the front end of the tongue."

"Q. What happened?"

"A. One of the last cars caught this front wheel and cut this tongue around and I remembered no more."

On cross-examination, appellee testified as follows:

"Q. You knew they (the skids) had to be taken down?"

"A. I asked if he was going to take my car out, and he ordered me to take them down."

"Q. The car was not moved until you took the skids down?"

"A. No, sir."

"Q. You say your wagon was standing at the side of that car?"

"A. Yes, sir."

"Q. And that wagon had what is called chocks behind it?"

"A. Yes, sir."

"Q. What size scantling were they?"

"A. About 4 by 6."

"Q. Four pieces of them?"

"A. Yes, sir."

"Q. One behind each wheel?"

"A. Yes, sir."

"Q. About that long?"

"A. Something like that."

"Q. You say you asked him if your wagon was close enough for the car to strike it?"

"A. I asked him if I must move the wagon back and he said, 'no.'"

"Q. You asked him if the wagon was close enough to be struck by the car?"

"A. Asked him if it was in the way."

"Q. You did move your wagon?"

"A. Yes, sir."

"Q. You moved the hind wheels and front wheels about a foot from where they were?"

"A. Yes, sir; I think so."

"Q. About a foot?"

"A. Yes, sir."

"Q. What did you move that wagon for?"

"A. I was afraid he might be mistaken and tear my wagon up."

"Q. You were afraid that he might be mistaken and that you would be too close and get your wagon torn up?"

"A. Yes, sir."

"Q. When you moved it you thought you moved it so that the car would not strike it?"

"A. Yes, sir."

"Q. And after you moved it you went up and got over the tongue, didn't you?"

"A. No, sir."

"Q. Didn't you state a while ago that you went and got over the tongue?"

"A. I think you are mistaken. I stepped back about two-thirds of the length of the tongue from the wheel."

"Q. What did you do that for?"

"A. If it hung on the wagon so there would be room to get out."

"Q. You thought it might hang on the wagon?"

"A. I didn't know but what it might."

"Q. You stopped there to see if it was going to hang on the wagon?"

"A. To wait."

"Q. To wait and watch to see if that car struck the wagon as it passed by?"

"A. Yes, sir."

"Q. That was your purpose in standing there?"

"A. No, sir; my purpose in standing there was to be out of the way and wait for the car to come by."

"Q. You were also watching to see if the car struck this wagon or if it would strike the wagon?"

"A. To see if the wagon would be missed."

"Q. You went there and stood by that tongue to see if the car would strike the wagon?"

"A. No, sir; didn't take my position by the tongue; didn't have time to pick a position."

"Q. You were standing there watching?"

"A. Yes, sir."

"Q. And watching to see if the car would miss the wagon as it went by?"

"A. I was watching to see if they would tear my wagon up."

Appellee's evidence as to the assurance given by the conductor and the manner of his injury is corroborated by that of his son and two or three other witnesses. In passing, we may say that appellant Bash denies that he assured appellee that his wagon was all right, and claims that he asked appellee if his wagon was in the clear, and appellee replied "Yes." But, in determining whether or not a peremptory should have gone, we must consider only the evidence for appellee.

This is not a case where the train was moved without any warning. The conductor had stated his purpose to appellee, and the latter knew that the train was to be moved. Nor is it a case where those in charge of the train might, with the exercise of ordinary care, have known of appellee's peril and have stopped the train in time to avoid injuring him. Neither appellant Bash nor the engineer was notified of appellee's purpose to attempt to move the wagon further away from the track. When he started to move the wagon the train was in motion. Nor is it a case predicated, nor could it be predicated, on the idea that appellee was not given a reasonable opportunity to reach a place of safety. Before he ran to the wagon he was in a place of safety, and had he remained there no injury would have resulted. The sole negligence relied upon, then, is that the conductor of the coal train assured him that his wagon was all right, and that his injuries were brought about because of his reliance upon the conductor's assurance. Indeed, the trial court permitted the case to go to the jury because of the assurance and the further fact that the conductor's knowledge of operating trains was superior to that of appellee, and the appellee, therefore, had a right to rely upon the assurance. It is manifest that whatever assurance the conductor gave related solely to the wagon. He did not tell appellee that, if the latter left a place of safety after the train

began to move' and attempted to move the wagon, he would be in no danger. Moreover, it is perfectly patent from a reading of appellee's evidence that he did not in any sense rely upon the assurance given him by the conductor. Had he relied upon the conductor's assurance, he would not have gone near the wagon. He testified unequivocally that he was afraid the conductor might be mistaken and that the train might tear his wagon up. He then left a place of safety and ran to the wagon for the purpose of moving it further from the passing train. After moving the wagon he stood near the tongue watching to see if the train would strike his wagon. He states that he thought he was out of the way. In taking this action he did not rely upon the assurance of the conductor, but acted in disregard of that assurance. Being afraid of the conductor's judgment in the matter, he substituted therefor his own judgment. He did this at a time when those in' charge of the train had no notice whatever of his purpose. That being true, they could not have apprehended that he would take such a course. Having assured him that his wagon was safe, appellants might have been liable for such consequences as would have reasonably followed in case the conductor was mistaken, i. e., for the destruction of the wagon. But upon no theory could appellants be held liable for such consequences as could not have been reasonably anticipated, that appellee would leave a place of safety and put himself in danger in case the moving train did happen to strike the wagon. The conductor's assurance had nothing whatever to do with appellee's being hurt. He did not act because of the assurance, but from fear that the conductor was mistaken in the assurance that he gave. In doing this, he relied solely upon his own judgment, his peril was of his own chosing, and he necessarily assumed the risk of being injured. That being true, it follows that the court erred in failing to award appellants a peremptory instruction.

Judgment reversed and cause remanded for a new trial consistent with this opinion.